1   CHARLES C. CORRELL, JR. (SBN 258085)
    *ccorrell@kslaw.com*
2   SAMUEL R. DIAMANT (SBN 288738)
    *sdiamant@kslaw.com*
3   SHANE BRUN (SBN 179079)
    *sbrun@kslaw.com*
4   BROOKE KOPEL (SBN 347526)
    *bkopel@kslaw.com*
5   King & Spalding LLP
    50 California Street, Suite 3300
6   San Francisco, CA 94111
    Telephone: (415) 318-1200
7   Facsimile: (415) 318-1300

8   BRUCE W. BABER (*pro hac vice* forthcoming)
    *bbaber@kslaw.com*
9   King & Spalding LLP
    1180 Peachtree Street, N.E.
10  Atlanta, GA 30303
    Telephone: (404) 572-4600
11  Facsimile: (404) 572-5100

12
    *Attorneys for Plaintiffs*
13  Dolby Laboratories Licensing Corporation
    and Dolby International AB
14

15              **UNITED STATES DISTRICT COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17

18  DOLBY LABORATORIES LICENSING              Case No.
    CORPORATION, a New York corporation,
19  and DOLBY INTERNATIONAL AB, a             **COMPLAINT FOR BREACH OF**
    Swedish private limited company,          **CONTRACT, COPYRIGHT**
20                                            **INFRINGEMENT, PATENT**
                Plaintiffs,                   **INFRINGEMENT, NEGLIGENT**
21       v.                                   **MISREPRESENTATION AND**
                                              **FRAUDULENT CONCEALMENT**
22  ROKU, INC., a Delaware corporation,

23              Defendant.

24                                            **DEMAND FOR JURY TRIAL**

25

26

27

28

1    Plaintiffs Dolby Laboratories Licensing Corporation and Dolby International AB
2 (collectively "Dolby") bring this action for breach of contract, copyright infringement, patent
3 infringement, negligent misrepresentation, and fraudulent concealment against Defendant Roku,
4 Inc. ("Roku"), and, for their complaint, state as follows:

5                                    **INTRODUCTION**

6    1.    Dolby brings this action to preserve the integrity of its licensing program, to maintain
7 fairness among its licensees, and to recover the substantial royalties and other legal damages Roku
8 owes Dolby for Roku's clear breaches of the license agreements between the parties, Roku's
9 widespread and continued copyright infringement, Roku's past patent infringement, Roku's active
10 concealment of its misconduct, and Roku's other wrongful acts.

11    2.    In 2015, Dolby and Roku entered into a software license agreement for Roku's
12 streaming device operating software known as "Roku OS," for the very limited purpose of allowing
13 Roku to test its software for interoperability with Dolby technologies. Under this software
14 agreement, Roku was expressly prohibited from including in its software or otherwise distributing
15 Dolby technologies; Dolby technologies would be only distributed by third parties (*e.g.*, TV
16 manufacturers) who were authorized to distribute them, and had the corresponding license
17 obligations. Roku well understood Dolby's licensing model, as it had been in place for decades,
18 and Roku itself had distribution agreements related to Roku's own hardware products. Roku also
19 recognized the enormous value it received from Dolby technologies by widely advertising and
20 extolling the benefit of having Dolby sound and video technology in its hardware products. But
21 while Roku publicly praised Dolby's technologies in promoting its hardware products, Roku
22 actively concealed from Dolby for years that Roku was breaching its limited software agreement
23 by distributing Dolby technologies in Roku OS for Roku's benefit and without any payment to
24 Dolby. Roku secretly and unilaterally disregarded its agreements with Dolby, broadly distributed
25 unauthorized copies of Dolby's technologies, and deprived Dolby of important controls that ensure
26 the utmost quality of the technology delivered, the security of Dolby's intellectual property, and
27 payment for Dolby's leading technologies. Roku decided that it wanted to directly implement
28

COMPLAINT                                                    CASE NO. _____

Dolby's technologies in its software in order to monetize and rapidly scale its Roku OS business. Roku ignored that it had no rights to do so.

3.      As Roku's business shifted towards Roku OS and rapidly expanded in recent years, Roku violated its license agreement with Dolby and distributed hundreds of millions of unauthorized and infringing copies of Dolby's technologies without paying Dolby appropriate compensation. Moreover, Roku prevented Dolby from discovering the truth by wrongly denying that it was distributing Dolby technology in Roku's software and further breached the parties' agreements by frustrating a third-party audit. Dolby files this action as a last resort to obtain full information regarding Roku's breaches and infringement, and to enforce Dolby's legal rights to receive fair compensation for Roku's unauthorized distributions of Dolby technologies.

4.      For nearly 60 years, Dolby has been a leader in innovating and delivering cutting-edge technologies that enable the creative community and that empower artists and content distributors with new and improving ways to convey rich entertainment experiences to their audiences. Roku is a sophisticated technology company that sells software and hardware for audio-visual streaming on televisions through an Internet connection and generates revenue primarily through selling advertising to consumers of streaming content. Roku recognizes the value of intellectual property, and has stated in its securities filings that it regards protection of its own IP as "critical to" Roku's success.

5.      Roku has also acknowledged the value to Roku of Dolby's proprietary technologies. As relevant to this matter, Roku entered into two license agreements with Dolby in 2015 and 2016 that granted Roku limited rights to certain Dolby technologies regarding Roku's software and devices, respectively, namely:

- A software agreement that ***expressly prohibited*** Roku from distributing any Dolby intellectual property ("Dolby IP") in connection with Roku's software. The software agreement only allowed Roku to test Dolby technologies for "interoperability" with Roku's software. While Dolby's technologies would be interoperable with Roku's software, distributions of Dolby technologies would be

1    handled by separate licensees who had the rights to do so as well as corresponding

2    obligations to Dolby.

3    • A device agreement that permitted Roku to include Dolby technology in Roku's

4    finished products and sell those products to consumers, so long as Roku obtained

5    Dolby technologies only from licensed parties, submitted those Roku products to

6    Dolby for quality performance testing, reported each sale and paid the

7    corresponding royalty, and complied fully with subsequent audits to confirm that

8    the information Roku had provided was complete and accurate, among other

9    obligations. The device license did not grant Roku any right to distribute Dolby

10   technology to Roku products after they were initially sold and in the hands of

11   consumers.

12   In agreeing to this structure, Dolby relied on Roku's contractual promises which, if followed, would

13   allow Dolby to track distributions of its technology through a broader ecosystem of licensee

14   partners and to be paid all that Dolby was owed.

15   6.    Dolby's licensing program and structure have been in place for decades and are well-

16   established in the entertainment and technology industries. Dolby licenses its technologies for

17   distribution only by parties that have entered into robust agreements with Dolby that include record-

18   keeping and reporting obligations, among others. Dolby provides only limited licenses to parties

19   that do not directly distribute Dolby technologies to end consumers but supply software, firmware

20   and other components of the products to other third-party manufacturers that are licensed for

21   distribution in their finished goods. Roku was well aware of this structure and entered into

22   agreements with Dolby that reflected these aspects of the Dolby licensing program.

23   7.    Roku nonetheless unilaterally decided not to abide by its contractual promises to Dolby

24   and not to respect the limitations on the rights that Dolby granted to Roku. In recent years, as Roku's

25   business moved from device sales to advertising facilitated by Roku OS, Roku made hundreds of

26   millions of distributions of unlicensed copies of Dolby technologies in connection with Roku OS,

27   which Roku regularly updates with new features to facilitate its advertising business and delivers

28   directly to its customers' entertainment devices. Despite having no rights to do so, Roku broadly

3

incorporated—and to this day incorporates—Dolby technologies into Roku OS and updates to Roku OS. In seeking to grow its Roku OS business and its substantial advertising revenues, Roku decided to distribute Dolby IP directly in Roku OS and its frequent updates, which would maximize the features of Roku's platform and its profits. Roku would thus benefit from Dolby's cutting-edge technologies in its software and not need to rely upon another party for distributing those technologies. Roku decided that it wanted to control the distributions of Dolby IP for its own convenience and benefit. But it did so without any of the corresponding obligations or payment to Dolby for Roku's broad and unauthorized distributions of Dolby IP.

8.     Roku has reaped significant profits by including Dolby's cutting-edge audio and video technologies in its software distributions. Rather than obtain additional license rights from Dolby and subject itself to the accompanying obligations such as record-keeping and reporting, Roku instead chose to conceal from Dolby for several years Roku's unauthorized distributions of Dolby technologies, thereby compromising Dolby's programmatic controls and visibility into the distribution of its technologies.

9.     Dolby does not have access to detailed information showing in real time how licensees are developing and distributing products with Dolby technology. Moreover, Roku encrypts Roku OS, which makes it impossible for Dolby to independently determine how the software is structured or if it contains Dolby IP. Until Dolby is provided with an opportunity to verify compliance, Dolby must trust that its licensees will comply with their license agreements, that licensees will not infringe Dolby IP or distribute Dolby IP without authorization, and that licensees will report to Dolby all distributions of Dolby's technologies and compensate Dolby for the inclusion of its technologies. Roku betrayed that trust.

10.     In 2020, Roku made false representations to Dolby that Roku was not distributing Dolby IP in Roku's software. Because Roku is clearly in a better position to understand its own product development and technology deployment regarding the encrypted Roku OS software, Dolby took its partner at its word and reasonably relied on Roku's misrepresentations.

11.     Dolby verifies licensee compliance through periodic royalty audits. In further breach of the parties' agreements, Roku hindered a third-party audit of Roku that was commenced in January

COMPLAINT                                                                CASE NO. _____

2021 for the audit period of July 2016 through December 2020. By refusing to provide relevant information requested by the auditor during the third-party audit, Roku's tactics undermined Dolby's licensing program, which relies on licensees only incorporating Dolby technology consistent with their license agreements, and deprived Dolby of its systems and controls for accurately and comprehensively tracking each of its distributions and reporting those to Dolby with appropriate compensation.

12.     While the full nature and extent of Roku's breaches is currently unknown because of Roku's ongoing refusal to comply with its audit obligations and provide Dolby with complete information about Roku's inclusion in Roku's products and distributions of Dolby technology, Dolby has determined that, for the limited audit period of 2016-2020, Roku's activities have included, at least:

- selling products containing Dolby technology without a license;
- distributing repeated software updates that included additional unauthorized copies of Dolby technologies; and
- infringing Dolby's intellectual property rights through unlicensed sales and distributions of Dolby technologies.

Thus far, Dolby has little to no information about Roku's distributions of Dolby technologies in the four years following the period requested in the audit. Dolby understands that Roku has at least continued to make unlicensed distributions of Dolby technology in connection with each of Roku's distributions of Roku OS, including all updates of Roku OS.

13.     By these wrongful acts, Roku has included Dolby's technologies broadly in Roku's products, which has made its offerings more attractive to potential customers and thereby increased Roku's own revenues and profitability at the expense of Dolby. In doing so, Roku failed to compensate Dolby for Roku's distributions and gained an unfair advantage in the marketplace.

## THE PARTIES

14.     Plaintiff Dolby Laboratories Licensing Corporation ("Dolby Licensing") is a New York corporation with its principal place of business at 1275 Market Street, San Francisco, California 94103. Plaintiff Dolby International AB ("Dolby International") is a Swedish private limited

1    company with its principal place of business at 77 Sir John Rogerson's Quay, Spaces South

2    Docklands, Dublin D02 VK60, Ireland. Both Dolby Licensing and Dolby International (together

3    referred to hereinafter as "Dolby") are indirect wholly-owned subsidiaries of Dolby Laboratories,

4    Inc., a Delaware corporation ("Dolby Laboratories").

5        15.    Defendant Roku, Inc. ("Roku") is a Delaware corporation with its principal place of

6    business at 1173 Coleman Avenue, San Jose, California 95110.

7        16.    Roku is a sophisticated technology company that sells products and software focused

8    on collecting advertising revenue alongside streaming audio-visual content on a television through

9    an internet connection, *e.g.*, by connecting users to streaming services such as Netflix, Hulu, the

10   Roku Channel, and others. Consumers who use Roku's products expect that their streaming

11   services will deliver high-quality audio and video to enable and enhance their viewing experiences,

12   and the Dolby brand is synonymous with excellence in both audio and video technology.

13                           **JURISDICTION AND VENUE**

14       17.    Jurisdiction as to the copyright and patent infringement claims asserted herein is

15   conferred on this Court by 28 U.S.C. §§ 1331 and 28 U.S.C. § 1338(a), respectively, and as to all

16   other claims asserted herein pursuant to 28 U.S.C. § 1367(a).

17       18.    This Court has jurisdiction over the person of Roku because Roku maintains its principal

18   place of business in San Jose, California.

19       19.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1)

20   and 28 U.S.C. § 1391 (b)(2) because Dolby Licensing and Roku both maintain their principal places

21   of business within the Northern District of California.

22       20.    In the applicable license agreements, the parties have selected as the forum and

23   submitted to the jurisdiction of the U. S. District Court for the Northern District of California. *See*

24   May 2015 Interoperability Agreement Section 9.7; September 2016 System Agreement Section

25   10.7.

26

27

28

COMPLAINT                                          CASE NO. _____

**BACKGROUND FACTS**

**Dolby Laboratories' History of Innovation**

21.     Since 1965, Dolby Laboratories has been a leader in innovation. Dolby Laboratories, itself and through its subsidiaries (including plaintiffs Dolby Licensing and Dolby International), has developed technologies that greatly improve the quality of audio and visual entertainment ("Dolby Technologies"). From movies and TV shows, to mobile applications, music, sports, and gaming, Dolby transforms the science of sight and sound into spectacular experiences for billions of people worldwide. Dolby partners with artists, storytellers, developers, and businesses to revolutionize entertainment and communications with its Dolby Atmos, Dolby Vision, Dolby Cinema, and Dolby.io products, among other Dolby Technologies. Today, Dolby Technologies are found in cinemas, streaming internet video, mobile media, digital broadcast TV, digital cable, and PC software products, among others.

22.     Dolby broadly licenses its technologies to hundreds of partners, including the largest technology companies in the world, to be included in their products and enable those products to deliver the highest quality audio and video content experiences. In most markets, Dolby does not sell products directly to consumers and relies on licensing its next generation Dolby Technologies to an extensive network of licensee partners.

23.     In a broad and growing entertainment and technology ecosystem, Dolby must establish and maintain controls on how its leading technologies are being distributed by its licensee partners, to whom, and in what quantities. To that end, Dolby's license agreements require its licensees to use Dolby Technologies only in certain specific ways under limited technology licenses and have important controls and reporting requirements for distributions and required payments, among other obligations.

24.     Dolby's licensees promise to accurately self-report to Dolby their distributions of products containing Dolby Technologies and to maintain detailed records on how they distribute Dolby Technologies and to whom. In a market with many players and changing offerings, Dolby's licensees are the only parties that can accurately track the inclusion of Dolby Technologies in their products, confirm to whom they have distributed Dolby Technologies and in what quantities, or

7

assess their payment obligations to Dolby. Over the course of its licensing program, Dolby has trusted that its licensees will comply with their limited licenses and payment obligations and that they will not distribute Dolby Technologies in ways that are not licensed, or without making the payments that are owed.

25.     To verify the accuracy of a licensee's reporting of sales and compliance with its other contractual obligations, Dolby has broad rights under its license agreements to engage independent third-party professional audit firms to inspect its licensees' internal books and records with regard to their manufacturing and distribution processes. Because Dolby Technologies are so widely adopted across the entertainment and technology industries, Dolby's audit rights and the enforcement of licensee payment obligations help ensure a level playing field and prevent noncompliant licensees from gaining an unfair advantage over other licensees that follow the terms of their agreements with Dolby. If a licensee fails to maintain auditable information, the third-party auditor, and therefore Dolby, cannot verify how Dolby Technologies were distributed in a broad entertainment and technology ecosystem or that Dolby received the appropriate payment.

26.     Dolby's carefully crafted licensing program provides Dolby with the necessary visibility into the technology supply chain and how Dolby's leading technologies are being used in the market. Given the proliferation of technology products, a licensee's failure to comply with its promises to Dolby can result in many millions of unauthorized distributions, with exponentially more distributions for software products that are continuously updated.

27.     Historically, most of Dolby's license agreements are in two categories: (1) implementation license agreements; and (2) system license agreements.

28.     Implementation agreements permit a licensee to use Dolby Technologies to create an implementation and then, following approval by Dolby, include that implementation on a chip or in a piece of software for distribution or sale to a Dolby system licensee. Dolby provides its implementation licensees with Dolby Technologies that are incorporated into products sold in intermediate markets, including integrated circuits. Dolby's implementation licensees are required to distribute Dolby Technologies only to authorized parties and report all of their distributions to Dolby.

8

29.    System agreements allow a licensee to purchase and incorporate authorized implementations created with Dolby Technologies, submit those completed products to Dolby for testing and approval, and, following approval by Dolby, distribute to end-users completed products containing those approved implementations.

30.    Dolby's implementation and system license agreements further provide for product testing to ensure that Dolby's quality standards are met in the implementations and end-user products that are ultimately distributed. Moreover, both the implementation and system license agreements require licensees to maintain complete and accurate records regarding their incorporation and distribution of Dolby Technologies that can be used in an audit to verify compliance with their contractual obligations to Dolby. Dolby's licensing program therefore establishes robust controls for how Dolby Technologies will be distributed and by whom, while providing for the quality associated with the Dolby brand in the marketplace.

31.    In addition, Dolby has entered into "interoperability agreements" with certain licensees (such as Roku) who create "middleware" software. Interoperability agreements facilitate the licensee's internal testing to ensure that its software can interoperate with Dolby Technologies, but *expressly prohibit* the software from containing (1) an implementation of any Dolby Technologies, or (2) any technology covered by a Dolby patent, Dolby copyrighted software, or any other Dolby intellectual property. The terms of Dolby's interoperability agreements are clear that the interoperable middleware must not itself contain any Dolby Technologies or Dolby IP, which are not licensed for inclusion or distribution as part of the middleware, and are clear that the interoperability licensees may not themselves distribute Dolby Technologies or any other Dolby IP.

32.    Through this carefully designed licensing program, which relies on licensees' strict compliance with their agreements, Dolby has established controls to test all implementations of Dolby Technologies, monitor the distributions of its technology through the ecosystem, and ensure that Dolby understands which parties receive which Dolby Technologies, and from whom. These processes are critical to ensuring the highest quality in the end-user's experience and that Dolby receives proper compensation for its licensee partners' use and distribution of Dolby IP.

9

COMPLAINT                                                        CASE NO. _____

**Relevant Technologies Developed By Dolby Laboratories**

33.     Since 2015, Roku has benefited from the inclusion of numerous Dolby Technologies that have enabled Roku's products. Dolby Technologies delivered functionality in these Roku products through high-quality digital audio and video. The Dolby Technologies licensed to Roku, subject to the terms of each respective license agreement, included the Dolby Digital Plus Consumer Decoder, Dolby MS12 Multistream Decoder, Dolby AC-4 Consumer Decoder, Dolby Vision Consumer Decoder, and Dolby Vision Advanced Imaging Package.

34.     Dolby Digital is an audio data rate reduction technology that restricts the digital encoding and decoding of audio data to those sounds that can be perceived by the human ear and that are not otherwise masked by other audio signals, and relies on other tools to reduce the amount of digital information that must be encoded and decoded to produce high-quality audio. Encoding is the process by which audio inputs are compressed down to an encoded bitstream, and decoding is the inverse process of converting the encoded bitstream for playback through the audio output on a user's device. Dolby Laboratories researchers, including employees of Dolby Licensing, spent years determining which portions of an audio signal are perceptible to a human listener, and which portions can be safely ignored, or even distorted by an encoding algorithm to achieve further gains in encoding efficiencies. With 5.1 channels of high-quality audio (equal to six discrete channels), Dolby Digital expands the left and right traditional stereo (or 2-channel) sound to deliver 360 degrees of surround sound. Originally launched in cinema applications, Dolby Digital is still used in the encoding and decoding of digital sound in a variety of storage media, including DVDs.

35.     Dolby Digital Plus is an advanced surround sound audio technology. With 7.1-channel capability (equal to eight discrete channels), Dolby Digital Plus further improves sound quality and is better optimized to be used in streaming, on-demand, and downloaded content. Dolby Digital Plus is used in, for example, home theaters, smartphones, tablets, operating systems, and internet browsers.

36.     The Dolby MS12 Multistream Decoder provides a single-package solution for decoding premium audio television content. Dolby MS12 converts the audio output to a standard Dolby Digital bitstream of up to 5.1 channels or a Dolby Digital Plus bitstream of up to 7.1 channels. In

COMPLAINT                                                                                    CASE NO. _____

addition, a decoded two-channel downmix from any multichannel input is created, so consumers always get a signal that matches their specific home systems. Thus, Dolby MS12 reduces the complexity of integrating multiple audio technologies and provides a consistent volume level across programs and sources to make listening more enjoyable. Dolby MS12 also enables Dolby Atmos and Dolby AC-4 technologies, which paves the way for next-generation audio experiences.

37.    Dolby AC-4 delivers the highest audio quality to the consumer, but at a much lower bandwidth than other formats and with compression efficiency up to 50 percent better than current broadcast-standard technologies. Dolby AC-4 delivers immersive audio, enabling sound to move around the audience in three-dimensional space. Dolby AC-4 provides personalized audio streams that enable broadcasters to provide customized presentations and elements that consumers can select to enjoy audio that matches their interests, among other next-generation features.

38.    Dolby now delivers much more than audio.  For example, Dolby Vision is an enhanced form of high dynamic range ("HDR") imaging that can use 12-bit color, resulting in about 68 billion colors that create a dramatically richer, true-to-life image. Dolby Vision also provides dynamic metadata using different settings optimized for each scene and takes full advantage of the different capabilities of each HDR display, providing the viewer with the most true-to-life version of films, television shows, and gaming experiences, among others.

39.    Dolby Laboratories and/or Dolby Licensing own registrations of their claims to copyright in numerous computer programs, other computer software works, code, documentation, specifications, and other works that embody or relate to Dolby Technologies (collectively, the "Dolby Copyrighted Works"). As relevant here, Dolby Licensing's claims to copyright in computer software works, identified more specifically below, each of which is part of the Dolby MS12 and other Dolby Technologies and is essential to the encoding or decoding function (collectively, the "Asserted Dolby Works"), are registered with the United States Copyright Office.

**Roku's Business Evolves From Devices to Roku OS**

40.    Roku was founded by Anthony Wood in 2002. According to statements on Roku's website, Wood founded Roku with the vision that the internet would transform television for creators, viewers, and advertisers. In making his vision a reality, Wood created (in Roku's words)

"the first and only purpose-built TV OS, transforming the television set from a simple one-way receiver into an internet-enabled device connecting viewers to a growing library of content available online." *See* https://www.roku.com/about/history-of-roku.

41.    In 2008, Roku launched its first streaming player that incorporated Roku OS. As described in further detail below, Roku has expanded its business substantially in the years since 2008, as viewers and content creators have moved away from broadcast television and towards internet streaming offerings. During 2023, more than 100 billion hours were streamed on Roku's platform, with viewers averaging over 4 hours per day per account in Q4 of 2023.

42.    Roku's business has evolved significantly since the time that it initially entered into the relevant license agreements with Dolby in 2015 and 2016, which are described in more particularity below. During this time, Roku's business has operated in two revenue segments, identified consistently in Roku's public securities filings as: (1) the "player" or "device" segment; and (2) the "platform" segment.

43.    For the "player" or "device" segment, Roku reports that revenues are generated from the sale of streaming players, Roku-branded TVs, smart home products and services, audio products, and accessories as well as revenue from licensing arrangements with service operators.

44.    Roku knew that Dolby Technologies would drive consumer demand for its streaming devices and advertised those products accordingly. For example, in a 2016 blog post, Roku encouraged its customers to "[d]ial up the impact of your entertainment with the enhanced sound of Dolby Audio" for sound optimization, surround sound capabilities, accessibility features, abundant content options, and Dolby Atmos® compatibility. *See, e.g.*, https://www.roku.com/blog/using-dolby-audio-to-enhance-your-roku-audio-experience.

45.    As another example, Roku advertises its Roku Streambar as "a fully immersive experience for your entertainment, featuring Dolby Audio, as four internal speakers fill your room with sound" and uses the federally-registered Dolby Audio logo to promote its Streambar product. When announcing the release of Roku Ultra in September 2020, Roku wrote that users could "[s]tream in extraordinary Dolby Vision picture quality and experience immersive Dolby Atmos

sound." Roku's players and branded televisions directed end-users to Roku OS, through which Roku made substantial advertising revenues, among other things.

46.     Roku has sold various devices over the years and launched the following devices in the years indicated: Roku DVP N1000 (known as the "Netflix Player") (2008); Roku SD (2009); Roku HD-XR (2009); Roku HD (2010); Roku XD (2010); Roku XDS (2010); Roku 2 HD (2011); Roku 2 XD (2011); Roku 2 XS (2011); Roku LT (2011); Roku Streaming Stick (2012); Roku 3 (2013); Roku 4 (2015); Roku Express (2016); Roku Express 4K+ (2016); Roku Ultra (2019); Roku Streaming Stick 4K (2020); Roku Streambar (2020); and Roku Streambar Pro (2021).

47.     In addition to players and streaming "sticks," Roku has developed "Roku TVs" that run on Roku OS. In August 2014, Roku launched, in collaboration with certain original equipment manufacturer ("OEM") partners, Roku TV models that run on Roku OS. In 2023, Roku began selling its own Roku TVs.

48.     In recent years, Roku has shifted its business model to generate substantial revenues from Roku OS, which enables Roku's "platform" business segment. While device sales remain important to Roku's business model, they are primarily used as a way to engage consumers with the features of Roku OS that monetize consumer streaming through advertisements and other revenue-generating services.

49.     In Roku's "platform" segment, revenues are generated from the sale of digital advertising (*e.g.*, direct and programmatic video advertising, media and entertainment promotional spending, and related services) and streaming services distribution (*e.g.*, subscription and transaction revenue shares, the sale of premium subscriptions, and the sale of branded app buttons on remote controls). As Roku's founder Anthony Wood explained in a 2019 interview, "Roku is essentially an advertising company. That's where we generate the bulk of our gross profit. It comes from ads."[1]

50.     Roku advertises through Roku OS in several ways, which have changed over time. As just one example, Roku creates "shoppable" ads that allow consumers to use their remote to click

---

[1] Will Hearst, *Anthony Wood and the Future of Streaming,* ALTA (Aug. 12, 2019), https://www.altaonline.com/dispatches/a5326/alta-qa-anthony-wood-and-the-future-of-streaming/

COMPLAINT                                                                              CASE NO. _____

on a button that will send a text or email and allow them to start shopping on the advertised apps or websites.[2] Roku also places video advertisements on the free video on-demand services available through Roku OS, such as the Roku Channel. Roku reported in its Form 10-K for 2023 that the Roku Channel was one of the top ten streaming apps in the United States.

51.     Roku OS is the most critical component of Roku's platform segment and drives Roku's revenues in all of the categories above. As Roku described in its form 10-K annual report for 2023:

> Our TV streaming platform enables content partners and advertisers to reach audiences that are increasingly unreachable on traditional TV. Each user on our streaming platform creates multiple revenue opportunities for Roku through activities such as navigating through the Roku home screen, watching ad-supported content, or signing up for subscription services. We measure monetization of our platform by calculating the average revenue per user ('ARPU'), which we believe represents the inherent value of our business model, and gross profit.

52.     Since 2016, Roku's platform revenues have grown significantly year-over-year, from approximately $100,000,000 in annual revenues in 2016 to approximately $3 billion in annual revenues in 2023. There has been less growth in Roku's "device" or "player" segment, which has increased over time but at a much lower rate. Roku's public filings with the U.S. Securities and Exchange Commission show this shift in Roku's business model:

| Year | Platform Revenue | Device/Player Revenue |
| --- | --- | --- |
| 2016 | $104,720,000 | $293,929,000 |
| 2017 | $225,356,000 | $287,407,000 |
| 2018 | $416,863,000 | $325,643,000 |
| 2019 | $740,776,000 | $388,145,000 |
| 2020 | $1,267,744,000 | $510,644,000 |
| 2021 | $2,264,920,000 | $499,664,000 |
| 2022 | $2,711,441,000 | $415,093,000 |
| 2023 | $2,994,105,000 | $490,514,000 |

---

[2] *What makes a good shoppable TV streaming ad? Q&A with Roku's head of Product Louqman Parampath,* (Apr. 27, 2023), https://advertising.roku.com/learn/resources/what-makes-a-good-shoppable-tv-streaming-ad-qa-with-rokus-head-of-product-louqman-parampath/.

53.     As shown above, Roku has generated nearly $11.5 billion in net revenues from its platform business alone between 2016 and the end of 2023. In Roku's Form 10-Q dated April 26, 2024, Roku described how Roku streaming devices may operate at a loss but "should result in increased platform revenue and platform gross profit over time."

54.     For Roku's streaming content, high quality sound and video delivered in Dolby formats with Dolby Technologies is critical to attracting Roku's viewers, who Roku then monetizes through advertising. Consumers expect that streaming video content will have both high-quality audio and high-quality video, each of which is enabled by the Dolby Technologies that Roku chose to distribute. The sound and picture on Roku's streaming platform also enable Roku customers to view Roku's revenue-generating ads. For example, as Roku has repeatedly and consistently stated in its securities filings, *"[a]udio is an important part of the TV streaming experience . . ."* Roku Inc. Annual Report (Form 10-K) (Mar. 2, 2020) (emphasis added); *see also* Roku Inc., Annual Report (Form 10-K) (Mar. 1, 2018); Roku Inc., Annual Report (Form 10-K) (Mar. 1, 2019); Roku Inc., Annual Report (Form 10-K) (Mar. 2, 2020); Roku Inc., Annual Report (Form 10-K) (Feb. 26, 2021); Roku Inc., Annual Report (Form 10-K) (Feb. 18, 2022); Roku Inc. Annual Report (Form 10-K) (Feb. 16, 2023).

55.     Despite booming revenues and profits from its platform business during this period, Roku never paid Dolby any compensation for the unlicensed and infringing Dolby Technologies Roku chose to include and distribute in connection with Roku OS and updates to Roku OS.

**The Relevant License Agreements Between Dolby and Roku**

56.     Recognizing the value of Dolby Technologies in delivering streaming entertainment experiences, Roku entered into license agreements with Dolby starting in 2015. Dolby granted Roku limited rights to specific Dolby Technologies, which rights were conditioned on Roku's compliance with its contractual promises.

57.     First, for valuable consideration, Dolby and Roku entered into the May 12, 2015, Interoperability License Agreement No. AGR1506009 (the "Interoperability Agreement"). This agreement gave Roku limited rights to use Dolby Technologies *only* for the testing of Roku's middleware such as Roku OS. The agreement was entered into "for the sole purpose of verifying

and demonstrating" the compatibility of Dolby Technologies with Roku's middleware. *See* Interoperability Agreement, Section 3.1. Other Dolby licensees with different license agreements and related obligations would distribute Dolby Technologies in their TVs and other devices at the time of initial sale. Under these third-party license agreements, these other Dolby licensees who had distribution rights would also have the corresponding obligations to track the distribution of Dolby's IP and report to Dolby. Importantly, the Interoperability Agreement *explicitly prohibited* Roku from distributing Dolby IP. *See* Interoperability Agreement, Sections 2.2., 4.1.

58.     Second, for valuable consideration, Dolby and Roku entered into the September 8, 2016, System License Agreement No. AGR1523048 (the "System Agreement"). Provided that Roku complied with its requirements, the System Agreement allowed Roku to obtain authorized implementations of certain Dolby Technologies, incorporate those implementations in Roku's Licensed Products sold, report all such distributions to Dolby, and pay royalties for those sales as set forth in the Addenda to the System Agreement. A royalty was due any time a product with Dolby IP is "Sold," which is broadly defined to include any distribution. For example, Roku would pay Dolby a contractual royalty upon the Sale of a Roku branded streaming stick or other hardware device.

59.     The System Agreement imposes critical reporting obligations on Roku, and it also gives Dolby broad audit rights to ensure Roku was complying with all its contractual obligations and limitations. Importantly, the System Agreement applies only to devices Sold to end-users and does grant any license for software "middleware," for which Roku received only the very limited testing rights under the Interoperability Agreement. Moreover, the System Agreement does not grant Roku any rights to deliver additional copies of Dolby Technologies to products after they are initially Sold and in the hands of consumers, and expressly states that there are no implied licenses granted under it. Roku further represented and warranted that it would not "make, use, Sell or import a product containing Dolby IP if such product violates intellectual property rights of [Dolby]," which would include any unlicensed distribution of any Dolby Technologies. *See*, System Agreement, Section 8.3.

60.     Finally, the parties entered into certain addenda to the System Agreement, each for

16

valuable consideration, namely:

   a.  On September 8, 2016, an addendum for the Dolby MS12 Multistream
       Decoder (the "September 2016 Addendum");

   b.  On April 26, 2019, an addendum for the Dolby Digital Plus Consumer
       Decoder and the Dolby MS12 Multistream Decoder (the "April 2019
       Addendum"); and

   c.  On April 20, 2020, an addendum for the Dolby Digital Plus Consumer
       Decoder, the Dolby MS12 Multistream Decoder, the Dolby MS12
       Multistream Decoder with Atmos, and the Dolby AC-4 Consumer Decoder
       (the "April 2020 Addendum").

61.   Appendix B3 in each addendum provided the agreed royalty rates and formulas. Each of the addenda confirms Roku's agreement at Appendix B3 that "[t]he royalty rates below represent consideration of the aggregate relative values and expiration dates of the Technology. These rates were selected for the convenience of the Parties to avoid the difficulty and expense of implementing a more complex matrix of multiple rates dependent upon expiration dates, relative valuations and products."

62.   In licensing Dolby Technologies to Roku, Dolby provided Roku with much more than a mere license to Dolby's patented or copyrighted technologies. Dolby provided to Roku a vast quantity of additional intellectual property, including trade secrets, confidential know-how, copyrighted source code, and rights to use Dolby's trademarks to promote Roku's products. Dolby also provided substantial amounts of Dolby's other proprietary technical information and materials, including testing information, technical bulletins, manuals, and other deliverables, each with its own rights and corresponding obligations for Roku's use.

### Roku Failed to Accurately Report Distributions and Infringed Dolby's IP

63.   Because Roku provided limited and incomplete information in connection with Dolby's attempts to conduct a third-party audit, Dolby does not yet know the full extent of Roku's contractual breaches, copyright infringement, and patent infringement. In addition, the attempted audit only covered the period of July 1, 2016 to December 31, 2020, so Dolby has no auditable

17

information as to Roku's conduct after that period. To Dolby's knowledge at this time, however, Roku has breached the License Agreements and infringed Dolby's IP in at least the primary ways described below. Dolby reserves the right to amend its claims for any additional breaches or infringement that are later determined through additional information.

Roku included Dolby IP in Roku OS and wrongfully distributed Dolby IP on a massive scale

64.     In knowing violation of the Interoperability Agreement, Roku unilaterally decided to include Dolby IP in its distributions of its Roku OS software stack to its customers on a massive scale and/or by otherwise distributing implementations of Dolby Technologies without any license to do so. Roku thus both breached the Interoperability Agreement and also infringed Dolby's IP, including but not limited to the registered copyrights for the Asserted Dolby Works.

65.     Roku's broad unauthorized distributions of Dolby Technologies deprived Dolby of the systems and controls it carefully puts in place to track the distributions of Dolby Technologies in the broad ecosystem of licensees and end-users. For example, Dolby's implementation license program requires those licensees to provide detailed reporting showing that implementations are distributed only to royalty-paying system licensees with specific contractual consequences if there are any failures under the terms of those agreements. Roku never received the rights of an implementation licensee and, if it had been, Dolby would have included important protections in an appropriate implementation agreement. Because the Interoperability Agreement never contemplated (and expressly prohibited) any distributions by Roku of Dolby IP, those contractual protections and obligations were not contained in that agreement.

66.     Roku's actions also deprived Dolby of the systems and controls that Dolby had put in place to track royalty-bearing sales by parties such as third-party OEM manufacturers, and Roku made additional unlicensed distributions to those products once they were in the hands of consumers, with no contractual rights or controls in place. Roku's decision to distribute Dolby IP in Roku OS was made for Roku's own benefit and convenience and in disregard of Dolby's contractual and intellectual property rights or Dolby's programmatic controls.

67.     Roku has argued that it was merely the "middleman" that distributed an approved implementation. That conduct, however, was specifically and intentionally prohibited by the

18

Interoperability Agreement. Section 2.2 of the Interoperability Agreement provides that "no rights are granted to Licensee under this Agreement with respect to the manufacture or Sale of Implementations," and Section 4.1 stated that "Middleware shall not contain any Dolby IP or Deliverables." Roku had no right to distribute any implementation that included Dolby Technologies.

68.    Roku did not pay Dolby any compensation for its unlicensed and infringing distributions of software that contained Dolby Technologies.

69.    Moreover, because Roku is focused on the constant delivery of new and improved products, Roku regularly pushes new versions of its software to devices and hardware that are already in use, for Roku's own benefit. As Roku stated in its Form 10-Q for the third quarter of 2017, "To attract and retain users, we need to be able to respond efficiently to changes in consumer tastes and preferences and continue to increase the type and number of content offerings. Effective monetization requires us to continue to update the features and functionality of our streaming platform for users, content publishers and advertisers."

70.    Roku has no right to include any Dolby Technologies in any distribution after the product is sold and in the hands of consumers.  Any distribution by Roku of a new version of Roku OS that contains unlicensed copies of Dolby Technologies is an independent breach of the Interoperability Agreement and is an independent copyright infringement, entitling Dolby to damages.

71.    Dolby's claims for unauthorized distributions of Dolby Technologies are severable, such that the cause of action for each of Roku's unauthorized distributions of Dolby Technologies and through each iteration of Roku OS or updated versions thereof accrued separately.

72.    Roku made several major updates to Roku OS during relevant time periods, each of which included new and improved features to Roku OS and each of which, on information and belief, contained Dolby IP for which Roku owes Dolby compensation. These Roku OS updates are pushed automatically to the Roku customers' devices and cannot be declined by the customer. In particular:

    a.   In 2015, Roku released Roku OS 7.0.

19

b.   In 2017, Roku released Roku OS 8.0.

c.   In 2018, Roku released Roku OS 9.0.

d.   In 2021, Roku released Roku OS 10.0.

e.   In 2022, Roku released Roku OS 11.0.

f.   In 2023, Roku released Roku OS 12.0.

g.   In 2024, Roku released Roku OS 13.0.[3]

<u>Roku included an unlicensed decoder that infringed Dolby's patented technology</u>

73.     Separate and apart from Roku's unlicensed distributions of Dolby Technologies set forth above, Roku released in or around November of 2018 an update to its platform named "Roku OS 9.0," which included an implementation of audio compression technology that Roku purportedly received from an unlicensed third-party source and that purports to comply with the AC-3 Digital Audio Compression Standard for such technology (the "AC-3 Standard") adopted by the United States Advanced Television Standards Committee ("ATSC").

74.     Roku never received from Dolby a license for Dolby Digital technology (which complies with the AC-3 Standard) under any system license addendum and order form. Moreover, Dolby's system licensees are required to source implementations only from authorized parties (also known as "Qualified Suppliers"). *See, e.g.*, System Agreement, Section 2.3.

75.     Prior to January 15, 2019, Roku broadly distributed Roku OS 9.0 to Roku streaming players, Roku TV models and Roku TV wireless speakers. On information and belief, each copy of Roku OS 9.0 that Roku distributed to its devices included the third-party implementation of the AC-3 audio compression technology.

76.     United States Patent No. 6,339,757 ("the '757 Patent" or the "Asserted Dolby Patent"), entitled "Bit Allocation Method for Digital Audio Signals," issued on January 15, 2002. A true and correct copy of the '757 Patent is attached as **Exhibit A**. As shown in **Exhibit B**, use of the AC-3 audio compression technology included in Roku OS 9.0 practices each and every limitation of at least claims 1, 2 and 3 of the '757 Patent.

---

[3] Roku likely made many other unlicensed distributions of Dolby Technologies in between each of these major version updates.

77.     Roku has had knowledge of and/or was willfully blind to the '757 Patent long before its inclusion of the AC-3 audio compression technology in Roku OS in November 2018. At least as early as December 19, 2014, Dolby provided Roku with written notice of the '757 Patent, which notice was sent to at least five Roku employees, including Roku's CEO, Roku's General Counsel, and a Senior Vice President of Roku. The '757 Patent was also included, prior to November 2018, in lists, made available to Dolby licensees, including Roku, of the patents owned by Dolby that protect various Dolby Technologies. At the time Roku began practicing the inventions of the '757 Patent, Roku was, at best, willfully blind to the '757 Patent.

78.     With actual notice of the '757 Patent, Roku proceeded to internally test and distribute Roku OS 9.0 and the AC-3 implementation contained therein, thereby infringing, contributing to infringement of, and inducing infringement of the '757 Patent by users of Roku-enabled devices that used the AC-3 implementation contained therein to practice the inventions of the '757 Patent.

### Roku's Misrepresentations and Refusal to Provide Complete Information

79.     Roku encrypts Roku OS software code and has never provided Dolby with decrypted Roku OS software code. Because Dolby could not itself confirm the specific configuration of Roku OS, Dolby reasonably relied on Roku's statements to Dolby regarding Roku OS.

80.     On March 6, 2020, Dolby and Roku had an in-person meeting at Roku's Los Gatos, California office to discuss Roku OS and Dolby Technologies. During that meeting, Roku's product management team made clear representations that Roku was not distributing Dolby IP in Roku's software distributions. For example, Roku's product managers conveyed to Dolby that Dolby's implementation licensee delivered the Dolby Technologies on systems-on-chips directly to the OEM, *i.e.*, a distribution path that was consistent with and as contemplated by the terms and limitations of Roku's Interoperability Agreement. Roku then explained that Roku delivers the Roku OS system image to the OEM licensee *without any Dolby IP*. These statements were, however, false when made. In fact, Roku was including implementations of Dolby Technologies in Roku's software distributions, without any license to do so. At the time of the March 2020 meeting, Roku was providing frequent updates to Roku OS that included unlicensed Dolby IP. Roku's failure to disclose this fact in a discussion regarding distribution of Dolby IP was a materially misleading

omission by Roku on which Dolby reasonably relied.

81.     Because Roku product managers are in a much better position than Dolby to understand Roku's own internal product development and technology distributions to Roku's customers and other third parties, and because Roku OS is encrypted software that Dolby cannot independently access to test, Dolby reasonably relied on Roku's representations and assurances that Roku was in compliance with the limitations in the Interoperability Agreement. On information and belief, Roku's employees either knew that these statements were false when made, or, alternatively, to the extent that Roku's employees did not know that these statements were false when made, Roku's employees had no reasonable grounds for believing that the representations were true when they made them. Roku made these false statements and omissions intending for Dolby to rely upon them, and Dolby did in fact rely on these statements and omissions to its detriment, believing, based on Roku's representations, that Roku was not distributing Dolby IP in violation of the limitations of the Interoperability Agreement, when Roku was in fact doing so. The truth came to light years later.

82.     On January 8, 2021, Dolby exercised its contractual rights under the License Agreements to inspect Roku's books and records for the inspection period July 1, 2016 to December 31, 2020 and engaged a third-party audit firm.

83.     Roku resisted the auditor's requests for contractually-required information and attempted to limit the scope of the audit. Throughout 2021, Roku argued that Roku OS should not be within the scope of the audit, contrary to the terms of the parties' license agreements, and again refused to provide information on any Dolby Technologies in Roku's distributions of and updates to Roku OS. Had this information been timely provided, Dolby would have known that Roku was improperly distributing unlicensed copies of Dolby Technologies. Roku's refusal to provide technical information showing the presence of Dolby Technologies in Roku's software distributions prevented Dolby's discovery of its claims for breach of contract and infringement.

84.     In February 2022, Roku started providing some limited information in response to Dolby's audit requests. While Roku did not provide any technical information or code that would allow Dolby to verify whether and, if so, how Dolby IP was being distributed by Roku in Roku OS, Roku's statements in February 2022 were inconsistent with its prior statements to Dolby in March

2020, when Roku had expressly denied (and failed to disclose) any distribution of Dolby IP. Dolby did not discover that Roku's prior statements were false until, at the earliest, February 2022, when Roku finally began providing some limited information in response to audit requests regarding Roku OS. Dolby could not have discovered these facts sooner in light of the encryption of Roku OS and resulting need to rely on statements and information from Roku. As noted above, Roku had generally withheld information from Dolby until a full year into the audit, and Dolby had relied on Roku's prior misrepresentations, which expressly denied the distribution of Dolby IP.

85.     During 2022, Dolby asked Roku for TV model numbers and brands by manufacturer so that Dolby could try to match Roku's representations of its distributions of Dolby Technologies against data reported to Dolby by other third parties. Roku refused and said Dolby should ask the third parties themselves, *i.e.*, Roku's OEM partners to whom Roku was delivering Roku OS.  The OEMs, however, would likely not have information about Roku's subsequent distributions of additional copies of Dolby Technologies after the products are sold and in the hands of consumers.

86.     In July 2022, Dolby requested that Roku provide TV brand, model numbers, Roku platform, manufacturer, manufacturer model number, Dolby Technologies, serial numbers and distribution counts to determine the volume of Roku TVs that received Dolby IP distributions from Roku. Roku again refused.

87.     In September 2022, Dolby's auditor provided a draft audit report based on the very limited information that Roku provided and other information that Dolby was able to ascertain from third-party implementation and system licensees for the audit period. While the initial draft report adopted assumptions that were very favorable to Roku, it showed significant unlicensed and unpaid distributions of Dolby Technologies by Roku in multiple ways described in further detail herein.

88.     After receiving the draft audit report, Roku requested that Dolby and its auditors consider new information that Roku had not previously provided, so-called "activation" data that purportedly identifies when a product is first turned on by the consumer after the initial sale and calls back to Roku's systems. In Roku's view, only considering "activations" would result in a lower level of noncompliance than indicated by the September 2022 draft audit report. Dolby did not agree that there was any basis to condition a royalty obligation or other contractual requirement

on some limited number of products that were "activated" but nevertheless agreed to consider any verifiable information that Roku was willing to provide about Roku's distributions of Dolby Technologies. At Roku's specific request, Dolby and its auditors analyzed the activation data over the course of several months during 2023. While reserving all rights and in an attempt to resolve its dispute with Roku, Dolby explained the resulting legal liability to Roku.

89.     In December 2023, Roku flatly denied that it had any additional payment obligations to Dolby. Dolby disagreed with Roku's assertions, reserved all rights, and continued to engage with Roku in the interest of partnership. Those discussions continued through June of 2024.

90.     As noted above, the audit information and responses that Roku provided were neither sufficient nor complete, and do not address any activities in the unaudited period following 2020. The parties engaged in discussions between January 2021 and June 2024 regarding these audit-related issues.

91.     Dolby discovered that Roku had no intention to comply with its audit obligations or engage in settlement discussions when Dolby requested as a condition to further discussions that Roku enter into a formal tolling agreement suspending the running of any applicable limitations for the duration of the tolling period. On June 21, 2024, Roku refused to enter into such an agreement, thereby making plain its strategy to delay the filing of any lawsuit. Once Dolby discovered the need to proceed with litigation, it proceeded diligently to file this lawsuit.[4]

## COUNT ONE

## BREACH OF CONTRACT – FAILURE TO PAY ROYALTIES/UNLICENSED SALES

92.     Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

93.     In 2015 and 2016, Dolby and Roku entered into two main agreements that are relevant to this action: (1) the May 12, 2015 Interoperability Agreement, which gave Roku limited rights to use Dolby Technologies for testing Roku's middleware such as Roku OS, but explicitly prohibited

---

[4] The California Judicial Council's Emergency Rule 9 operates to toll "the statutes of limitations and repose for civil causes of action that exceed 180 days . . . from April 6, 2020, until October 1, 2020," a period of 178 days. In addition to the delayed discovery, fraudulent concealment, and equitable tolling described herein, Dolby is entitled to tolling under Emergency Rule 9 for any causes of action that accrued on or before October 1, 2020.

24

distribution by Roku of any implementations of any Dolby Technologies or any Dolby IP; and (2) the September 8, 2016 System License Agreement and Addenda thereto, which only allowed distribution of Dolby IP in Roku-branded "Licensed Products" such as Roku players and streaming sticks, with a host of corresponding obligations such as only obtaining Dolby technologies from licensed parties, submitting all products for testing and approval for quality assurance, reporting to Dolby each Sale, and paying the corresponding royalties (collectively, the "License Agreements").

94. The License Agreements were the necessary framework of the parties' relationship and established important limits and controls on how Roku could access, incorporate, distribute, and track Dolby's industry-leading audio and video technologies. If Roku desired to make distributions of Dolby Technologies outside of the scope of the License Agreements, it was required to negotiate new rights with Dolby to accommodate any changes to Roku's business practices. Dolby reasonably expected that Roku would comply with the rights and obligations, including any limitations, in the License Agreements and notify Dolby to the extent that any different or additional rights were needed by Roku.

95. For its platform business, Roku contracted with Dolby under the Interoperability Agreement, which granted Roku an extremely limited license to test the compatibility of Dolby Technologies in Roku OS, but expressly prohibited Roku from distributing any Dolby technology. Roku had no rights to distribute any Dolby Technologies in Roku OS or otherwise, and certainly not to end-users once the products were sold and in the hands of consumers.

96. Effective May 12, 2015, for valuable consideration, Dolby and Roku entered into the Interoperability Agreement. The Interoperability Agreement is a valid and enforceable contract supported by adequate, mutual consideration.

97. Under the Interoperability Agreement, Roku was only permitted to test and verify that Roku OS was interoperable with the approved Dolby implementations that Roku received from a Dolby implementation licensee (generally, a "system on chip" or "SoC" manufacturer) and/or the Licensed Products made by a Qualified Recipient (generally, a third-party OEM, which had a separate system license agreement with Dolby). The Interoperability Agreement could not be clearer: it granted only limited testing rights, did not grant distribution rights, and in fact expressly

prohibited distribution. This structure allowed Roku to test that its software was compatible with Dolby implementations but without any distribution rights, which rights were limited to OEMs who had the corresponding contractual obligations associated with distribution rights under separate system license agreements.

98.     Section 1.4 of the Interoperability Agreement defines "Deliverables" in relevant part as "the materials Licensor makes available *for internal use* by Licensee for each Technology and which describe the Technology in detail." (emphasis added.) Accordingly, Roku was not granted any rights under the Interoperability Agreement to use or distribute externally the Deliverables that it received from Dolby.

99.     Section 1.8 of the Interoperability Agreement defines an "Implementation" as "a component supplied only to an intermediate market for inclusion in a Licensed Product that implements a Licensed Technology, which is: (i) an integrated circuit or other similar type of electronic device that implements the Licensed Technology in hardware, (ii) object code that performs the Licensed Technology and is approved by Licensor, (iii) an electronic circuit board containing either '(i)', or '(ii)', or (iv) a software driver for incorporation in an end-user software application."

100.    Section 1.13 of the Interoperability Agreement defines "Middleware" as "software that provides an interface to an Implementation. Middleware is interoperable with an Implementation but *does not contain any Dolby IP or Deliverables*." (emphasis added). Roku was therefore contractually prohibited from including any Dolby IP or Deliverables in its middleware, the integrated software stack that Roku delivered as "Roku OS."

101.    The Interoperability Agreement did not provide for the distribution or "Sale" by Roku of any products to end-users. If the parties had intended to allow Roku to distribute Dolby Technologies to end-users, they would have needed to enter into either an implementation or system license agreement providing for such distribution, with the corresponding controls, record retention requirements about those distributions, and payment obligations (including, if relevant, upon the distribution of product updates or upgrades).

102.    Section 3.1 of the Interoperability Agreement makes clear that the license grant was

26

"*for the sole purpose of verifying and demonstrating* that i) the Middleware it has developed is compatible with the intended Implementations of the Licensed Technology or ii) that Implementations made by an Implementation Licensee or Licensed Products made by a Qualified Recipient are compatible with Licensee's software, products or services. The Deliverables may not be used by Licensee for any other purpose." (emphasis added).

103.    Section 4.1 of the Interoperability Agreement provides: "Unless expressly approved by Licensor in writing, *Middleware shall not contain any Dolby IP* or Deliverables." (emphasis added).

104.    Roku also had no rights under the Interoperability Agreement (or otherwise) to manufacture or Sell implementations. The Interoperability Agreement expressly prohibited Roku from any distribution or other transfer of an Implementation.

105.    Section 2.2 of the Interoperability Agreement provides: "Licensee may receive sample quantities of Implementations from Implementation Licensees for the purpose of i) evaluating or testing the Licensed Technology contained on the Implementation, and ii) developing, testing, and demonstrating Middleware ('Purpose')" and that "[n]o rights are granted by Licensor except as expressly provided herein and, specifically, no rights are granted to Licensee under this Agreement with respect to the manufacture or Sale of Implementations. Except as provided above, mere purchase or receipt of an Implementation does not convey a license nor imply a right under any patent, or any other industrial or intellectual property right of Licensor, to use such Implementation or to transfer ownership of an Implementation to any other party." Section 1.16 of the Interoperability Agreement defines "Sale," "Sell" or "Sold" (or any variation thereof) as "to sell, supply, offer for sale, dispose, rent, lend, lease, commercialize, exploit, distribute or otherwise transfer."

106.    Despite not having a license agreement in place to distribute Dolby Technologies or include them in Roku OS or any software distribution, Roku unilaterally decided to distribute Dolby Technologies in initial distributions of Roku OS, and thereafter to end-users directly through many millions of updates of Roku OS, each of which, on information and belief, included additional, unlicensed copies of Dolby Technologies.

27

107.     Roku was also required to identify and report to Dolby any entities to whom it had distributed basic test streams during the previous calendar quarter. Section 5.1 of the Interoperability Agreement requires that: "[w]ithin thirty (30) days after the end of a calendar quarter, Licensee will deliver to Licensor a report identifying those entities to whom it has redistributed the Basic Test Streams during the previous calendar quarter." Roku provided no such reports.

108.     By design, and unlike system license agreements and implementation license agreements, the Interoperability Agreement does not have more extensive books and records requirements because the Interoperability Agreement specifically prohibited Roku from distributing any Dolby IP. Nevertheless, the records retention and inspection provisions of the System Agreement set forth in paragraphs 115-118 below applied to any distribution of Dolby IP and thus applied to any unauthorized distributions by Roku of middleware or other software containing Dolby IP.

109.     Roku's unlicensed distributions of any Dolby IP and implementations of Dolby Technologies both breached the express and implied promises under the parties' License Agreements and infringed Dolby's copyright and other rights in the original, creative works of authorship and copyrightable subject matter that comprise Dolby Technologies under the laws of the United States, as set forth in more detail below.

110.     For its device business, Roku contracted with Dolby under the System Agreement, pursuant to which royalties would be paid upon Roku's sale of products containing various industry-leading Dolby Technologies.

111.     Effective September 8, 2016, for valuable consideration, Dolby and Roku entered into the System Agreement. The System Agreement is a valid and enforceable contract supported by adequate, mutual consideration.

112.     Provided that Roku complied with its requirements, the System Agreement allowed Roku to include certain Dolby Technologies in the Licensed Products Roku "Sold," and required Roku to pay royalties for those Sales as set forth in the Addendum to the System Agreement.

113.     The System Agreement does not by itself grant a license to any Dolby Technologies

COMPLAINT                                                      CASE NO. _____

unless and until an Order Form or Addendum is executed by the parties that specifically itemizes the one or more Dolby Technologies being licensed. The System Agreement provides the terms and conditions under which any license is granted in an Addendum or Order Form.

114.    Section 4.2 of the System Agreement obligates Roku to pay Dolby royalties on all Licensed Products "Sold" in accordance with the Addendum covering such Licensed Products, which is found under Appendix B3 to the form Addendum.  Under Section 10.17, Roku's reporting and payment obligations to Dolby under the System Agreement are triggered at the time Roku first "Sells" a product. Nothing further by Roku or its customer is required to trigger Roku's reporting and payment obligations to Dolby. Notably, the System Agreement does not grant Roku any rights to deliver additional copies of Dolby Technologies to these products after they are initially Sold and in the hands of consumers.

115.    Under Section 4.6 of the System Agreement, Roku must issue quarterly reports identifying any Sales of a Licensed Product. It must also maintain complete books and records under Section 4.7 for seven years after a quarterly report is submitted.

116.    Roku's responsibilities to maintain information regarding distributions of Dolby IP were broader than the scope of the System Agreement and extended to any distribution of Dolby IP by Roku. Section 4.7 of the System Agreement provides, "Licensee shall keep complete books and records about its operations relating to the manufacture or sale of all products that perform or embody Licensor intellectual property, in whole or in part…" Roku was aware of its contractual obligations to maintain and report complete information associated with the distribution of Dolby Technologies in Roku's products.

117.    Section 4.7 of the System Agreement provides Dolby with important audit rights and further requires Roku to "cooperate with this examination and provide reasonable access to … all information … (including information not related to Sales of Licensed Products necessary to verify the integrity of [Roku's] records and the accuracy of [Roku's] Quarterly Reports), and … relevant personnel requested by [Dolby] … as necessary to allow the examination to be completed in a timely manner."

118.    Dolby's audit rights were so important that the parties agreed, in Section 5.11 of the

System Agreement, that an actual or threatened violation of them by Roku would constitute irreparable injury for which monetary damages are an inadequate remedy, thereby entitling Dolby to equitable relief, including injunctive relief or specific performance, in any court, in addition to its legal remedies.

119.    The System Agreement is very clear with respect to the rights it licenses and those it does not. Section 6.1 of the System Agreement provides that Dolby "grants [Roku] a personal, indivisible, non-exclusive, worldwide license to the Dolby IP, solely for each Technology identified in the Order Form, and solely for the duration of the applicable term on the Order Form for each such Technology." Section 10.4 defines "Dolby IP" as including "Patents, Trademarks, know-how and copyrighted works for a particular Technology…" Section 6.2 of the System Agreement states that "[t]here are no implied licenses under this Agreement, and all rights not expressly granted to [Roku] are reserved by [Dolby]."

120.    Section 10.11 of the System Agreement defines a Licensed Product to mean a consumer product approved by Dolby that is complete and ready to use for an end-user market, that contains an approved implementation of one or more Dolby Technologies, that performs the technology in whole or in part, and that bears a trademark of Roku.

121.    Section 9.8 of the System Agreement provides that the prevailing party in any action under the agreement will be entitled to recover from the other party all costs and expenses incurred in that action or any appeal therefrom including all reasonable attorneys' fees and other related costs.

122.    Section 10.8 of the Interoperability Agreement provides that the prevailing party in any action under the agreement will be entitled to recover from the other party all costs and expenses incurred in that action or any appeal therefrom, including all reasonable attorneys' fees and other related costs.

123.    Dolby has performed each and every one of its material obligations under the License Agreements, except for any obligation that has been excused as a result of Roku's breaches.

124.    By distributing products containing Dolby Technologies beyond the scope of the limited licenses granted by the License Agreements, Roku has separately and independently materially

breached, *inter alia*, Sections 2.2, 3.1 and 4.1, and 5.1 of the Interoperability Agreement; and Sections 6.1 and 10.11 of the System Agreement; and Appendix A3 of the Addenda to the System Agreement. Discovery may reveal additional breaches of the License Agreements by Roku.

125.    Dolby has been damaged by Roku's breaches of contract in an amount to be determined at trial.

<u>**COUNT TWO**</u>

<u>**BREACH OF CONTRACT – BREACH OF REPRESENTATION AND WARRANTY**</u>

126.    Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

127.    In recognition of the importance of the limited license grant, Roku represented and warranted to Dolby in Section 8.3 of the System Agreement that Roku "will not make, use, Sell or import a product containing Dolby IP if such product violates intellectual property rights of [Dolby]…"

128.    Roku's representation and warranty not to violate Dolby's IP rights included any technology over which Dolby then had intellectual property rights, such as patents or copyrights, any later acquired intellectual property rights, and any other technology beyond the limited scope of the license rights that Dolby had granted.

129.    Roku breached its promise not to exceed the scope of the licenses granted by the License Agreements by Selling products containing Dolby Technologies that were not included within the scope of the limited licenses granted by Dolby. In breach of its express warranty, Roku sold unlicensed copies of Dolby Technologies that infringed Dolby's copyrights and at least the '757 Patent.

130.    Dolby is entitled to injunctive relief restraining Roku from engaging in any further such breaches of contract. Unless Roku is enjoined and prohibited from any further such breaches, Roku will continue to breach its promise not to exceed the scope of the licenses granted by the License Agreements.

131.    Dolby has been damaged by Roku's breach of contract in an amount to be determined at trial.

31

**COUNT THREE**

**BREACH OF CONTRACT – BREACH OF IMPLIED COVENANT**

132.     Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

133.     Throughout its many year commercial relationship with Roku, Dolby provided Roku a vast quantity of intellectual property above and beyond patent rights, including trade secrets, confidential know-how, copyrighted source code, and rights to use Dolby's trademarks to promote Roku's products. Dolby also provided substantial amounts of Dolby's other proprietary technical information and materials, including testing information, manuals, and other deliverables. *See, e.g.*, Interoperability Agreement, Section 1.5; System Agreement, Section 10.4.

134.     Dolby's delivery of this valuable package of information to Roku and the parties' collaboration to implement Dolby Technologies in relevant products gave rise in each License Agreement between Dolby and Roku to an implied negative covenant that Roku would not exceed the scope of the limited licenses granted therein, regardless of whether such conduct might constitute an infringement of Dolby's patent, copyright, or other intellectual property rights.

135.     Roku breached the implied covenant not to exceed the scope of the licenses granted by the License Agreements by making distributions containing Dolby Technologies that were not included within the scope of those License Agreements.

136.     Dolby Licensing is entitled to injunctive relief restraining Roku from engaging in any further such breaches of the implied covenant. Unless Roku is enjoined and prohibited from any further such breaches, Roku will continue to breach its implied covenant not to exceed the scope of the licenses granted by the License Agreements.

137.     Dolby has been damaged by Roku's breach of the implied covenant in an amount to be determined at trial.

**COUNT FOUR**

**BREACH OF CONTRACT – FAILURE TO COMPLY WITH AUDIT OBLIGATIONS**

138.     Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

32

139.    Roku breached Section 4.7 of the System Agreement by failing to permit Dolby's auditor to inspect, examine and make abstracts of Roku's books and records so as to verify the accuracy of Roku's reporting, failing to provide the auditor with reasonable access to all required information that would allow the audit to be completed in a timely manner, and otherwise failing to cooperate with the audit.

140.    Roku further breached the License Agreements by failing to provide Dolby access to "(i) all information (including information not related to Sales of Licensed Products necessary to verify the integrity of [Roku's] records and accuracy of [Roku's] Quarterly Reports), and (ii) relevant personnel requested by [Dolby] or [Dolby's] agents as necessary to allow the examination to be completed in a timely manner." System Agreement, Section 4.7.

141.    The contractual provisions requiring Roku to permit Dolby to audit Roku's books and records are definite and unambiguous and entitle Dolby to compliance by Roku in accordance with their terms. The parties expressly agreed in the System License Agreement that an actual or threatened violation by Roku of Section 4.7 (Dolby's inspection rights) will constitute irreparable injury for which monetary damages are an inadequate remedy, thereby entitling Dolby to equitable relief, including injunctive relief or specific performance, in any court, in addition to its legal remedies. *See* System Agreement, Section 5.11.

142.    Dolby is entitled to preliminary and permanent relief from this Court ordering that Roku specifically perform under Section 4.7 of the System Agreement by providing Dolby with complete auditable information. This relief is necessary to preserve the status quo between the parties, which is the legally relevant contractual relationship in existence before the controversy between the parties arose.

143.    In the event that the audit results in a finding of Unpaid Royalties for any consecutive four quarter period exceeding 5% of the total royalties due during such period, Roku must pay for the full cost of any examination and collection undertaken by or for Dolby including all accounting, audit and legal fees and costs, plus interest at the rate of 1.0% per month. *See* System Agreement, Section 4.8.

COMPLAINT                                                    CASE NO. _____

144.    Dolby has been damaged from Roku's failure to comply with the audit provisions between January 2021 and the present, including but not limited to incurring all of the audit-related fees and costs incurred by Dolby prior to the commencement of this litigation.

**COUNT FIVE**

**COPYRIGHT INFRINGEMENT**

145.    Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

146.    As noted in paragraph 39 above, plaintiffs Dolby Laboratories and/or Dolby Licensing own copyrights in the Dolby Copyrighted Works, which comprise a large number of works of various types, including computer programs and computer software works. The Dolby Copyrighted Works include the following computer programs and/or computer software works, each of which is part of the Dolby MS12 Technology and is essential to the encoding or decoding function (collectively, the "Asserted Dolby Works"):

- the Dolby Audio Block Encoder Module;
- the Dolby Bitstream Information (BSI) Module for encode routines – DD;
- the Dolby Bitstream Information (BSI) Module for encode routines – DDP;
- the Dolby CRC encoder module calculation routines; and
- the Dolby Re-entrant revision of DD+ encoder auxiliary data packing routines.

147.    Each of the Asserted Dolby Works was created by employees of Dolby Laboratories and/or Dolby Licensing. The copyright rights in the Asserted Dolby Works, including all of the rights of a copyright owner under 17 U.S.C. § 106, are owned by Dolby Licensing as the author and/or as the assignee of Dolby Laboratories.

148.    Dolby Licensing's claims to copyright in each of the Asserted Dolby Works have been registered with the U.S. Copyright Office and are the subject of the following registrations, each of which has an effective date of March 6, 2018:

| Work | Registration No. |
|------|------------------|
| Audio Block Encoder Module | TXu 2-074-382 |

34

| Work | Registration No. |
|------|------------------|
| Bitstream Information (BSI) Module for encode routines – DD | TXu 2-074-383 |
| Bitstream Information (BSI) Module for encode routines – DDP | TXu 2-074-384 |
| CRC encoder module calculation routines | TXu 2-074-624 |
| Re-entrant revision of DD+ encoder auxiliary data packing routines | TXu 2-074-381 |

149.    Each of the Asserted Dolby Works is an original, creative work of authorship and copyrightable subject matter under the laws of the United States. Dolby Laboratories and Dolby Licensing have complied in all respects with the Copyright Laws of the United States, and the Register of Copyrights has issued to Dolby Licensing Certificates of Registration for each of the Asserted Dolby Works.

150.    The Dolby Copyrighted Works are original, expressive works of authorship that have been developed through many years and hundreds if not thousands of hours of creative endeavor by employees of Dolby Laboratories and Dolby Licensing. The Dolby Technologies have been continuously updated and improved by Dolby over many years to incorporate additional creative expression developed by Dolby Laboratories and Dolby Licensing, including numerous versions of the Dolby Copyrighted Works that were created for different settings and particular uses and applications. Each of the Asserted Dolby Works is the product of a substantial number of hours of Dolby Laboratories and Dolby Licensing employees' time, and is protected under the Copyright Laws of the United States from unlawful and unauthorized copying and distribution.

151.    Roku has infringed Dolby Licensing's copyrights in the Asserted Dolby Works and Dolby Licensing's exclusive rights under the Copyright Laws by reproducing and selling, without a license from Dolby Licensing or authorization of Dolby Licensing to do so, Roku products that include the Asserted Dolby Works, portions thereof, and/or works that are based on or are derivative thereof (the "Roku Infringing Products"). Although the complete scope of Roku's infringement and the names of all of the Roku Infringing Products are not yet known to Dolby, examples of the Roku

Infringing Products that are not licensed or authorized by Dolby are all Roku products that include and/or access any version of Roku OS and any other Roku product that includes Dolby MS12 Technology, including but not limited to the Roku Express, model number 3960R; the Roku Streaming Stick 4K, model number 3820R2; the Roku Ultra, model number 4802R; the Roku Streambar, model number 9102R; Roku TVs manufactured by various OEMs; the Roku Pro Series 4K TV, model numbers: 55R8B5, 65R8B5, 75R8B5; the Roku Plus Series 4K TV, model numbers: 55R6A5R, 65R6A5R, 75R6A5R; the Roku Select Series 4K TV, model numbers: 43R4A5R, 50R4A5R, 55R4A5R, 65R4A5R, 75R4A5R; Roku Wireless Speakers, model number 9020R2; and the Roku TV Wireless Soundbar, model number 9301R, among others.

152.    Upon information and belief, the infringed elements of the Asserted Dolby Works include the code contained in those works and the structure, organization and content of the works.

153.    Upon information and belief, Roku was aware that the Roku Infringing Products were not licensed. Roku's infringements of Dolby Licensing's copyrights in the Asserted Dolby Works therefore are and have been knowing, deliberate, and willful.

154.    By its unauthorized copying, use, and widespread distribution of the Asserted Dolby Works and the Roku Infringing Products, Roku has violated Dolby Licensing's exclusive rights under 17 U.S.C. § 106.

155.    Roku has realized unjust profits, gains, and advantages as a proximate result of its infringement.

156.    Roku will continue to realize unjust profits, gains, and advantages as a proximate result of its infringement as long as its infringement is permitted to continue.

157.    Dolby Licensing is entitled to injunctive relief restraining Roku from engaging in any further such acts in violation of the United States copyright laws. Unless Roku is enjoined and prohibited from infringing Dolby Licensing's copyright rights, Roku will continue to intentionally infringe Dolby Licensing's copyright rights.

158.    As a direct and proximate result of Roku's willful copyright infringement, Dolby Licensing has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Dolby Licensing is entitled to recover from Roku, in amounts to be determined at trial,

36

the damages Dolby Licensing has sustained and will sustain, and any gains, profits, and advantages obtained by Roku as a result of Roku's acts of infringement and Roku's sale and distribution of the Roku Infringing Products.

### COUNT SIX

### COPYRIGHT INFRINGEMENT – CONTRIBUTORY INFRINGEMENT

159.    Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

160.    Roku has also induced others, without the authorization of Dolby Licensing, to reproduce and/or sell the Roku Infringing Products and has thereby induced and materially contributed to infringement by those parties of Dolby Licensing's exclusive copyright rights.

161.    Upon information and belief, Roku has distributed the Roku Infringing Products to numerous companies and individuals, and has provided those companies and individuals with materials that enable those parties to—and that instruct those parties how to—use the Roku Infringing Works, with the understanding and intention that those companies and individuals would reproduce the Roku Infringing Works and/or distribute the Roku Infringing Products to third parties, all with the purpose of encouraging and promoting the unauthorized reproduction, distribution and use of the Roku Infringing Products. Users of the Roku Infringing Products must copy and use infringing elements of the Roku Infringing Products to use those products for encoding and decoding, in violation of Dolby Licensing's exclusive copyright rights. Such use is not licensed or authorized by Dolby Licensing, and Roku was aware, at all relevant times, that Roku did not have a license to use Dolby Technologies or the Asserted Dolby Works in the Roku Infringing Products. Roku has thus induced, caused, and materially contributed to the infringing acts of others by encouraging, inducing, allowing and assisting others to copy, reproduce and distribute the Roku Infringing Products.

162.    The identities of all of the specific companies and individuals to which Roku has distributed the Roku Infringing Products are not known to Dolby, due to Roku's failure to provide the relevant information in connection with Dolby's attempts to audit Roku's books and records in accordance with the License Agreements. Based upon the information provided by Roku to date,

37

those companies and individuals include Roku's customers for the Roku Express, model number 3960R; the Roku Streaming Stick 4K, model number 3820R2; the Roku Ultra, model number 4802R; the Roku Streambar, model number 9102R; Roku TVs  manufactured by various OEMs; the Roku Pro Series 4K TV, model numbers: 55R8B5, 65R8B5, 75R8B5; the Roku Plus Series 4K TV, model numbers: 55R6A5R, 65R6A5R, 75R6A5R; the Roku Select Series 4K TV, model numbers: 43R4A5R, 50R4A5R, 55R4A5R, 65R4A5R, 75R4A5R; Roku Wireless Speakers, model number 9020R2; and the Roku TV Wireless Soundbar, model number 9301R, among others.

163.    Upon information and belief, Roku's inducement of and material contribution to Roku's customers' infringements of Dolby Licensing's copyrights in the Asserted Dolby Works are and have been knowing, deliberate, and willful.

164.    By its unauthorized distribution of the Asserted Dolby Works and the Roku Infringing Products for use, reproduction and distribution by others, Roku has induced infringement and contributed to infringement, and has thereby violated Dolby Licensing's exclusive rights under 17 U.S.C. § 106.

165.    Roku has realized unjust profits, gains, and advantages as a proximate result of its inducement of and contributory infringement.

166.    Roku will continue to realize unjust profits, gains, and advantages as a proximate result of its inducement of and contributory infringement as long as its inducement of infringement and contributory infringement are permitted to continue.

167.    Dolby Licensing is entitled to injunctive relief restraining Roku from engaging in any further such acts in violation of the United States copyright laws. Unless Roku is enjoined and prohibited from contributing to and inducing others' infringement of Dolby Licensing's copyright rights, Roku will continue to intentionally induce and contribute to infringement of Dolby Licensing's registered copyrights.

168.    As a direct and proximate result of Roku's willful contribution to and inducement of copyright infringement, Dolby Licensing has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Dolby Licensing is entitled to recover from Roku, in amounts to be determined at trial, the damages Dolby Licensing has sustained and will sustain, and

any gains, profits, and advantages obtained by Roku as a result of Roku's inducement of and contributory infringement and Roku's sale and distribution of the Roku Infringing Products.

## COUNT SEVEN

### PATENT INFRINGEMENT – DIRECT INFRINGEMENT, CONTRIBUTORY INFRINGEMENT AND INDUCEMENT OF INFRINGEMENT OF U.S. PATENT NO. 6,339,757

169.    Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

170.    Plaintiff Dolby Licensing is the assignee and lawful owner of the '757 Patent, and holds all right, title and interest in and to the '757 Patent.

171.    During its term, the '757 Patent was valid and enforceable.

172.    Upon information and belief, Roku copied, tested and used the implementation of AC-3 audio compression technology described above prior to including that implementation in Roku OS 9.0 and, by doing so, Roku practiced the inventions of claims 1, 2 and 3 of the '757 Patent. Roku therefore is liable as a direct infringer of the '757 Patent.

173.    Roku has also indirectly infringed the '757 Patent by contributing to and/or inducing the making, using, selling, or offering for sale by others in the United States products that infringe the '757 Patent. Such products include, but are not limited to, Roku products that include Roku OS 9.0 and which include the implementation of AC-3 audio compression technology described above (the "Accused Products"). The Accused Products include, for example, Roku's Streaming Players with the following model numbers: 4661X, 4660X, 4640X, 4630X, 4620X, 4400X, 4230X, 4210X, 4200X, 3921X, 3920X, 3910X, 3900X, 3810X, 3800X, 3710X, 3700X, 3600X, 3500X, 3420X, 3400X, 3100X, 3050X, 3000X, 2720X, 2710X, 2700X, 2500X, 2450X, 2400X. According to Roku's release notes for OS 9.0, Roku anticipated providing the Roku OS 9.0 update to all Roku TV models. *See* https://www.roku.com/blog/os-9-release-notes. Discovery may reveal additional infringing uses, products, and/or models.

174.    Each of the Accused Products that include Roku OS 9.0 purports to comply with the AC-3 Standard promulgated by the ATSC.

39

175.    Software that complies with the AC-3 Standard meets the elements of at least claims 1, 2 and 3 of the '757 Patent. The Accused Products include and make use of software that complies with the AC-3 Standard and thereby fall within the scope of and include, either literally or under the doctrine of equivalents, all of the elements of the asserted claims of the '757 Patent.

176.    As described in paragraphs 73-76 above, and as shown in **Exhibit B**, software that complies with the AC-3 Standard includes all of the elements of claims 1, 2 and 3 of the '757 Patent.

177.    After receiving notice of the '757 Patent, Roku proceeded to make, use, test, sell, and/or offer to sell in this District and elsewhere in the United States, the Accused Products. By disseminating marketing materials, providing user and technical manuals relating to the Accused Products, and other acts, Roku actively induced infringement by encouraging others to directly infringe the Asserted Patent by utilizing the software in Roku OS 9.0 that practices the inventions claimed in claims 1, 2 and 3 of the '757 Patent.

178.    The implementation of the AC-3 Standard included in Roku OS 9.0, as distributed by Roku, is intended for use in practicing a patented process, is a material part of the inventions claimed in the '757 Patent, and is especially made and adapted for use in an infringement of the '757 Patent. The AC-3 implementation is not a staple article or commodity of commerce suitable for substantial non-infringing use.  Roku is therefore liable as a contributory infringer in accordance with 35 U.S.C. § 271(c).

179.    Roku actively encouraged, promoted, enabled and facilitated use by customers possessing Roku-enabled devices of the AC-3 implementation contained in Roku OS 9.0, which use infringed the asserted claims of the '757 Patent. Roku is therefore liable for inducement of infringement in accordance with 35 U.S.C. § 271(b).

180.    Roku engaged in such activities despite actual knowledge that its customers' actions constituted infringement of the '757 Patent. Roku knew and should have known that its actions would cause direct infringement of the '757 Patent.

181.    Roku willfully infringed the '757 Patent through January 15, 2019.

182.     Roku has known of or was willfully blind to the existence of the '757 Patent and its applicability to Roku's OS 9.0 since at least December 2014. Roku's subsequent acts of infringement were willful, and without any reasonable basis for believing it had the right to engage in the infringing conduct. In light of Roku's willful infringement, Dolby is entitled to increased damages of three times the damages assessed pursuant to 35 U.S.C. § 284, as well as an award of attorneys' fees pursuant to 35 U.S.C. § 285.

<h2 align="center">COUNT EIGHT</h2>

<h2 align="center">NEGLIGENT MISREPRESENTATION</h2>

183.     Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

184.     As summarized in detail in paragraphs 101-106 above, Roku had no rights under the Interoperability Agreement to (i) distribute any Implementations containing Dolby Technologies to any party (including but not limited to a Dolby system licensee); or (ii) distribute any Dolby Technologies to end-users. Despite the requirements and prohibitions of the License Agreements described above, Roku in fact chose to include Implementations containing Dolby Technologies (comprised of Dolby's copyrighted code and additional technical information and know-how) in software distributed by Roku.

185.     Roku distributed software that included Dolby Implementations in a software stack to third-party OEMs, and additional copies of Dolby Implementations to products that had been sold and were in the hands of consumers. After the initial distribution to the OEMs, Roku released updates to Roku software on a regular basis, which updates, on information and belief, also included Dolby Technologies in the software stack.

186.     On March 6, 2020, Dolby and Roku personnel had an in-person meeting at Roku's office in Los Gatos, California to discuss Roku OS and Dolby Technologies. Two Roku product managers attended this meeting along with a Dolby employee.

187.     As set forth in further detail in paragraph 80 above, Roku made clear representations to Dolby during the March 6, 2020 meeting that Roku was not distributing Dolby IP in Roku's software distributions.

41

188.    These statements were false when made. At that time, Roku was in fact including the Dolby Implementations in one software stack and distributing Implementations of Dolby Technologies without any license to do so, both to OEMs and to consumers.

189.    To the extent that Roku's employees did not know that these statements were false when made, Roku's employees had no reasonable grounds for believing that the representations were true when they made them.

190.    Roku made these false statements intending for Dolby to rely upon them, and Dolby did in fact rely on them to its detriment, continuing to believe, based on Roku's representations, that Roku was not distributing any Dolby IP in Roku's software products. Roku encrypts its Roku OS software, which cannot be independently accessed by Dolby. Dolby reasonably relied on Roku's representations and assurances that Roku was in compliance with the terms of the Interoperability Agreement, as opposed to distributing unlicensed Dolby Technologies on a massive scale in direct violation of the Interoperability Agreement.

191.    Dolby has been damaged by Roku's negligent misrepresentations and Dolby's reliance on Roku's misrepresentations were a substantial factor in causing its harm.

## COUNT NINE

## FRAUDULENT CONCEALMENT

192.    Dolby hereby repeats and incorporates the allegations set forth above as though fully set forth herein.

193.    As summarized in detail in paragraphs 101-106 above, Roku had no rights under the Interoperability Agreement to (i) distribute any Implementations containing Dolby Technologies to any party (including but not limited to a Dolby system licensee); or (ii) distribute any Dolby Technologies to end-users. Despite the requirements and prohibitions of the License Agreements described above, Roku included Implementations containing Dolby Technologies (comprised of Dolby's copyrighted code and additional technical information and know-how) in Roku's software stack that comprised Roku OS and Roku OS updates.

194.    Roku distributed Roku OS that included a Dolby Implementation in a single integrated software stack to third-party OEMs. After the initial distribution to the OEMs, Roku released

42

updates to Roku OS on a regular basis that, on information and belief, also included Dolby Technologies.

195.    As set forth in further detail in paragraph 80 above, Roku made clear representations to Dolby during the March 6, 2020 meeting that Roku was not distributing Dolby IP in Roku's software distributions.

196.    These statements were false when made. At that time, Roku was in fact including the Dolby Implementations in one software stack and distributing Implementations of Dolby Technologies without any license to do so, both to OEMs and to consumers. In failing to disclose these facts, Roku suppressed a material fact that it was under a duty to disclose to Dolby based on the parties' licensing relationship, Roku's sole access to the unencrypted Rokus OS code and any other detailed information on its products, and Roku's representations that it was not violating and would not violate Dolby's intellectual property rights.

197.    Dolby reasonably relied on Roku's assurances that its distribution model comported with the terms of the Interoperability Agreement, when Roku was in fact distributing unlicensed Dolby Technologies on a massive scale in direct violation of the Interoperability Agreement. Dolby would have asserted its rights earlier if Roku had disclosed its breaches of the Interoperability Agreement through the broad and unlicensed distributions of Dolby Technologies.

198.    In January 2021, Dolby commenced a third-party audit of Roku for the audit period of July 1, 2016 through December 31, 2020. Throughout 2021, Roku disputed that Roku OS was within the scope of Dolby's audit rights and refused to provide any data regarding Roku OS despite Dolby's auditors' repeated requests for information.

199.    On February 18, 2022, over a year after the audit was commenced, Roku started to provide some limited and unverifiable information in the connection with the audit. While there were limitations in the information provided, as of February 18, 2022, Roku provided information that was inconsistent with its prior March 2020 representations that Roku did not distribute Dolby IP in Roku OS. Dolby, however, could not verify this for certain because of the encrypted code.

200.    Dolby was diligent in seeking to verify Roku's compliance with the License Agreements through having discussions with Roku about its business model in 2020 and seeking to verify

43

Roku's compliance with its licenses during the audit beginning in 2021. Roku made false representations to Dolby, denying its broad distribution of Dolby IP in 2020, and then attempted to block Dolby's access to the truth through refusing to provide information in the audit until February 2022 when Roku provided some limited and unverifiable information. Because Roku encrypts its software, Dolby needed to rely on Roku's statements and could not have discovered the truth about Roku's unauthorized distributions of Dolby IP before, at the earliest, February 2022.

201.    Dolby has been damaged by Roku's fraudulent concealment and Dolby's reliance on Roku's misrepresentations was a substantial factor in causing its harm.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Dolby Licensing and Dolby International pray for relief and judgment as follows:

A.    For an award of compensatory damages in an amount according to proof for each and all of the causes of action set forth herein;

B.    For an award of prejudgment interest at the legal rate through the date of the judgment and/or at the contractual rate set forth by Section 4.8 of the System Agreement;

C.    For injunctive relief for specific performance that Roku must comply with its audit obligations as set forth in the License Agreements;

D.    For full costs of the audit including all accounting, audit, and legal fees as set forth by Section 4.8 of the System Agreement;

E.    For an award of attorneys' fees and costs incurred herein as provided by the License Agreements;

F.    For entry of judgment holding Roku liable for infringement of Dolby Licensing's copyright rights in the Asserted Dolby Works;

G.    For an order enjoining Roku, its officers, agents, servants, employees, attorneys and affiliated companies, its assigns and successors in interest, and all persons in active concert or participation with it, from continued acts of infringement of the copyrights in the Asserted Dolby Works;

44

H.  For an order enjoining Roku, its officers, agents, servants, employees, attorneys and affiliated companies, its assigns and successors in interest, and all persons in active concert or participation with it, from continued acts of contributory infringement and inducement of infringement of the copyrights in the Asserted Dolby Works;

I.  For an order that all copies of any Roku Infringing Products made or used in violation of Dolby Licensing's copyright rights, and all means by which such copies may be reproduced, be impounded and destroyed or otherwise reasonably disposed of;

J.  For an order awarding Dolby Licensing actual damages, profits, and/or statutory damages, according to proof, resulting from Roku's infringement of the copyrights in the Asserted Dolby Works and Roku's contributory infringement and inducement of infringement of the copyrights in the Asserted Dolby Works, together with prejudgment and post-judgment interest;

K.  For an order awarding Dolby Licensing its costs and attorneys' fees under 17 U.S.C. § 505;

L.  For entry of judgment that the '757 Patent was valid and enforceable through January 15, 2019;

M.  For entry of judgment that Roku is liable for infringement of one or more claims of the '757 Patent;

N.  For entry of judgment that Roku's infringement of the '757 Patent was willful;

O.  For entry of judgment that awards Dolby all appropriate damages under 35 U.S.C. § 284 for Roku's past infringement of the '757 Patent, including pre- and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284 and, if necessary to adequately compensate Dolby for Roku's

45

1    infringement, an accounting, including an award of enhanced damages by

2    reason of Roku's willful infringement of the '757 Patent;

3    P.    For an award of Dolby's reasonable attorneys' fees incurred in prosecuting

4    this action because this case is exceptional within the meaning of 35 U.S.C.

5    § 285; and

6    Q.    For any and all other legal and equitable relief as may be available under

7    law and that the Court may deem proper.

8

9    <u>**DEMAND FOR JURY TRIAL**</u>

10    In accordance with Rule 38 of the Federal Rules of Civil Procedure, plaintiffs Dolby

11    Licensing and Dolby International demand a trial by jury of all issues so triable.

12

13    Dated:    August 1, 2024              **KING & SPALDING LLP**

14

15                                          By: */s/ Charles C. Correll, Jr.*

16                                          Charles C. Correll, Jr.
                                            Samuel R. Diamant
                                            Shane Brun
17                                          Brooke Kopel
                                            KING & SPALDING LLP
18                                          50 California Street, Suite 3300
                                            San Francisco, California 94111
19

20                                          Bruce W. Baber (*pro hac vice* forthcoming)
                                            KING & SPALDING LLP
21                                          1180 Peachtree Street, N.E.
                                            Atlanta, Georgia 30309

22                                          M. Kyle Reynolds (*pro hac vice* forthcoming)
                                            KING & SPALDING LLP
23                                          3232 McKinney Avenue
                                            Suite 500
24                                          Dallas, Texas 75204

25                                          *Attorneys for Plaintiffs*
                                            Dolby Laboratories Licensing Corporation
26                                          and Dolby International AB

27

28

                                   46

COMPLAINT                                          CASE NO. _____